**In re CREDIT SUISSE–AOL SECURITIES LITIGATION.**

**Civ. Action No. 02–12146–NG.**

United States District Court, D. Massachusetts.

Dec. 7, 2006.

---

Daniel S. Sommers, Steven J. Toll, Cohen, Milstein, Hausfeld & Toll, Washington, DC, Donald R. Hall, Frederic S. Fox, Joel B. Strauss, Kaplan Fox & Kilsheimer LLP, Gregory Michael Egleston, Bernstein, Liebhard & Lifshitz, LLP, Menachem E. Lifshitz, New York, NY, Thomas G. Shapiro, Todd S. Heyman, Edward F. Haber, Theodore M. Hess–Mahan, Michelle H. Blauner, Shapiro Haber & Urmy LLP, Boston, MA, for Plaintiffs.

Avi S. Gesser, Lawrence Portnoy, Davis Polk & Wardwell, Michael W. Mitchell, Skadden Arps, Slate, Meagher & Flom LLP, Jeff E. Butler, Warren L. Feldman, Sean Murphy, Dean Kristy, Johanna Calabria, Clifford, Chance U.S. LLP, New York, NY, Gerald F. Rath, Robert A. Buhlman, Siobhan E. Mee, Jason D. Frank, Bingham McCutchen LLP, Jeffrey B. Rudman, Stephen A. Jonas, Jonathan A. Shapiro, Jared C. Miller, Wilmer Cutler Pickering Hale and Dorr LLP, Eben P. Colby, Michael M. Millett, Skadden, Arps, Slate, Meagher & Flom LLP, Boston, MA, Barbara A. Winters, Kenneth G. Hausman, Mark A. Sheft, Howard, Rice, Nemerovski, Canady, Falk Rabkin, San Francisco, CA, for Defendants.

Marc I. Gross, Stanley M. Grossman, Pomerantz, Haudek, Block Grossman & Gross, New York City, for interested party.

### MEMORANDUM AND ORDER RE: DEFENDANTS' MOTIONS TO DISMISS

GERTNER, District Judge.

(This Memorandum replaces the one issued on November 30, 2006, in that substantive errors in the text have been corrected that alter the effect of the Order (*see* p. 59). Defendant Quattrone's motion to dismiss is **DENIED**, where it had been erroneously stated as GRANTED. There

is no change as to the disposition of Defendant Rogers's motion to dismiss.)

## I. *INTRODUCTION*

This is a consolidated securities class action in which the court-appointed lead plaintiff, the Bricklayers and Trowel Trades International Pension Fund ("Plaintiff"), asserts claims on behalf of the class of individuals who purchased common stock of AOL Time Warner, Inc. ("AOL") from January 12, 2001, through July 24, 2002 (the "Class Period").

The defendants include Credit Suisse First Boston (USA), Inc. ("CSFB–USA"), an integrated investment bank; Credit Suisse First Boston, LLC ("CSFB"), a wholly-owned direct subsidiary of CSFB–USA; and four individuals who were employed by CSFB during all or part of the Class Period (collectively, "Defendants"). The individual defendants include James Kiggen and Laura Martin, former CSFB research analysts who had been responsible for investment research coverage of AOL during the Class Period. Kiggen and Martin reported to defendants Frank Quattrone, the former Senior Managing Director and Global Head of CSFB's Technology Group, and Elliot Rogers, who was the Managing Director and Global Director of Technology Research at CSFB during the Class Period.

The essence of the Plaintiff's claims is that during the Class Period, the Defendants issued thirty-five research reports in which they promoted AOL and encouraged investors to purchase its stock without revealing their knowledge of adverse information about AOL or their true beliefs about the company's precarious financial condition, beliefs and information which they intentionally withheld from the investing public. In fact, Plaintiff asserts that instead of providing unbiased, independent, research on AOL to investors, as

they were supposed to do, the Defendants were motivated to issue reports containing false and misleading information by their eagerness to win AOL's lucrative investment banking work.

As a result of the dishonest and misleading analyst reports filed by CSFB, AOL's stock price was inflated at the beginning of the Class Period and then proceeded to lose value, as negative financial information finally reached the market from other sources and undermined CSFB's projections. At the end of the Class Period, revelations in the *Washington Post* about alleged accounting gimmickry and the disclosure of an SEC investigation of these accounting practices resulted in a second decline in the value of AOL's stock.

Defendants initially moved to dismiss Plaintiff's First Amended Consolidated Complaint in February 2004. The motions to dismiss were heard before Magistrate Judge Dein on July 14, 2004, who issued a Report and Recommendation recommending dismissal of the complaint on March 8, 2005.[1] Plaintiff objected to the R & R. A hearing was held to consider the objections. After the hearing, I endorsed the R & R and dismissed the complaint, but dismissal was deferred until Plaintiff had time to file a Second Amended Consolidated Complaint, which Plaintiff did on December 16, 2005.

The Second Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws ("Complaint") (docket entry # 92) contains two counts. In Count I, Plaintiff asserts that Defendants CSFB, Kiggen, and Martin made material misstatements and omissions in violation of section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b–5(b) promulgated thereunder, 17 C.F.R.

---

**1.** The introduction and fact section of this opinion rely, in part, on Judge Dein's R & R.

§ 240.10b–5. In Count II, Plaintiff asserts that CSFB, CSFB–USA, Quattrone and Rogers acted as "control persons" in violation of section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

The matter is presently before me on the Defendants' motions to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) (Docket Nos. 94, 98, and 100). Defendants contend that even assuming that everything the Plaintiff alleges is true, and that the Defendants made actionable false and misleading statements, the Complaint should still be dismissed in its entirety because the Plaintiff has failed to allege that the Defendants' misconduct caused the Plaintiff's losses, referred to as "loss causation." Defendants also argue that Plaintiff has failed to plead reliance on the transaction, or "transaction causation," and that, in any event, Plaintiff's allegations regarding layoffs and an investigation at AOL, even if false, were not material. Defendants underscore the fact that this is an action against an analyst, not the company itself, and suggests that Plaintiff's claims should be viewed through a different lens than other 10b–5 actions.

The Defendants Quattrone and Rogers have also moved to dismiss Count II of the Complaint, which alleges control person liability.

## II. STANDARD OF REVIEW OF RECORD

### A. Motion to Dismiss Standard of Review

"In ruling on a motion to dismiss, a court must 'accept all well-pleaded facts of the complaint as true and draw all reasonable inferences in favor of the plaintiff.'" Moss v. Camp Pemigewassett, 312 F.3d 503, 506 (1st Cir.2002) (quoting Aybar v. Crispin–Reyes, 118 F.3d 10, 13 (1st Cir. 1997)). In doing so, "a court may properly consider the relevant entirety of a document integral to or explicitly relied upon in the complaint, even though not attached to the complaint, without converting the motion into one for summary judgment." Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1220 (1st Cir.1996) (superseded by Private Securities Litigation Reform Act, 15 U.S.C. § 78u–4(b)(1)–(2) (1997)). See also Watterson v. Page, 987 F.2d 1, 3–4 (1st Cir.1993) (court may consider on motion to dismiss "public record[s]," "document[s] central to plaintiffs' claim," and "document[s] sufficiently referred to in the complaint."). The court may grant dismissal "only if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" Roeder v. Alpha Indus., Inc., 814 F.2d 22, 25 (1st Cir.1987) (quoting Conley v. Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). However, the Court "need not credit a complaint's bald assertions or legal conclusions." Glassman v. Computervision Corp., 90 F.3d 617, 628 (1st Cir.1996) (internal quotations and citation omitted).

### B. PSLRA Heightened Pleading Requirements

In 1995, Congress enacted the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u–4, which marked an effort to curb abuse in private securities lawsuits. See Greebel v. FTP Software, Inc., 194 F.3d 185, 191 (1st Cir. 1999). The PSLRA requires that a complaint claiming securities fraud based on misstatements or omissions set forth "each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). Additionally, where a plaintiff may recover money damages "only on proof that a defendant acted with a partic-

ular state of mind," the PSLRA requires the complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). "The 'required state of mind' for liability under section 10(b) [of the Exchange Act] and Rule 10b–5 is referred to as 'scienter,' which the Supreme Court has defined as 'a mental state embracing intent to deceive, manipulate, or defraud.'" *Greebel,* 194 F.3d at 194 (*quoting Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 1381 n. 12, 47 L.Ed.2d 668)(1976). Therefore, under the PSLRA, the complaint must "state with particularity facts that give rise to a 'strong inference' of scienter, rather than merely a reasonable inference." *In re Cabletron Sys., Inc.,* 311 F.3d 11, 28 (1st Cir.2002).[2]

■ Although the pleading requirements in private securities fraud cases are strict, they obviously do not affect the standard of review for a motion to dismiss. *See Aldridge v. A.T. Cross Corp.,* 284 F.3d 72, 78 (1st Cir.2002). Accordingly, the following facts are viewed in the light most favorable to the Plaintiff.

### III. *STATEMENT OF FACTS*

#### A. *CSFB's Coverage of AOL*

On January 11, 2001, the merger of America Online, Inc. and Time Warner, Inc. became effective, resulting in the creation of a single entity, AOL Time Warner ("AOL"). The deal, which was valued at $106.2 billion and was one of the largest mergers in corporate history, represented the marriage of America Online's "new" media assets with Time Warner's "old" media assets. The stock of the newly com-

bined entities began trading on the New York Stock Exchange ("NYSE") the next day.

On January 12, 2001, the first day of the Class Period, CSFB issued a research report on AOL, which announced the merger and contained a "buy" rating, urging investors to purchase AOL common stock. Defendants Martin and Kiggen authored the report, along with two other CSFB analysts. At the time, Kiggen was a Managing Director of CSFB in charge of the Internet Research Group. He provided investment research coverage on AOL and was CSFB's lead analyst for AOL. He had covered AOL since its early days. Martin, a Chartered Financial Analyst ("CFA"), was also a Managing Director at CSFB with responsibility for providing research coverage on AOL. She had covered Time Warner before the merger.

Both Martin and Kiggen reported to Defendants Quattrone and Rogers. Quattrone, one of the most powerful executives at CSFB, had ultimate responsibility over all research analysts, traders and investment bankers who worked with technology-related companies. Rogers was reportedly Quattrone's deputy in charge of CSFB's Global Technology Group.

Plaintiff alleges that the January 12, 2001, report, as well as the other thirty-five reports on AOL that CSFB issued during the Class Period, were materially false and misleading because they encouraged investors to purchase AOL stock without disclosing negative information that CSFB, Kiggen, and Martin knew about AOL. Kiggen was an author of all of the thirty-five reports. Martin co-authored twenty-seven of them. The Plain-

---

**2.** Before the PSLRA, securities fraud claims had to meet the pleadings standards established by Fed.R.Civ.P. 9(b). In the First Circuit, these standards were as rigorous as the standards required by the PSLRA. *See Greebel,* 194 F.3d at 193 ("The PSLRA's pleading standard is congruent and consistent with the pre-existing standards" of the First Circuit, which "has been notably strict and rigorous in applying Rule 9(b) in securities fraud actions.") (*quoting Maldonado v. Dominguez,* 137 F.3d 1, 9 (1st Cir.1998)).

tiff contends that pressures to obtain AOL's lucrative investment banking work motivated Kiggen and Martin to compromise their independence and issue false and misleadingly optimistic research reports on AOL. This contention is supported by numerous detailed allegations.

For example, Plaintiff alleges that CSFB's efforts to win AOL's investment banking work began even before the merger of America Online and Time Warner. By December 2000, CSFB had made a number of investment banking pitches to AOL. Later that month, CSFB made a series of presentations to AOL; the two sides met for a "pitch" meeting. CSFB analysts were put forth as part of the firm's strategy to attract this work. In attempting to get AOL business, CSFB touted Martin as an award-winning analyst who would work on AOL–Time Warner matters, and underscored Kiggen's close personal relationship with Richard Hanlon, AOL's Senior Vice President of Investor Relations. In short, according to the Complaint, Quattrone and the CSFB bankers had no qualms about using CSFB's "independent" research analysts to lure investment banking business from AOL.

### B. *Failure to Disclose Inflated Values*

In its 44–page Complaint, the Plaintiff provides details of the reports at issue in this case, including the date on which CSFB issued each report, its contents, and the reasons why each report allegedly was false and misleading. Specifically, Plaintiff claims that the reports contained false, unsupported and artificially inflated twelve-month price targets of up to $80 per share, even though CSFB's internal analyses showed a target price of no more than $65 per share. Further, Plaintiff alleges that the Defendants acknowledged

that the published target prices were too high and could not be justified. The reports also contained revenue and earnings estimates for AOL that the Defendants knew to be too high, and failed to disclose information that Martin, Kiggen and Rogers knew about the severely declining national advertising market and its likely impact on AOL's financial health. In short, the Plaintiff contends that the reports painted a substantially more positive picture of AOL, its financial outlook and the strength of its stock than they would have if Defendants had revealed the true information they had.

On various occasions during the Class Period, in particular during the period from January 12, 2001, through September 12, 2001, Martin expressed concern that CSFB's published estimates for AOL were too high, and attempted to persuade Kiggen that they should be lowered. Kiggen agreed with Martin on various occasions, but wanted to postpone lowering the figures until the revision had been negotiated with AOL.

In the end, CSFB did not significantly reduce its price target for AOL until September 15, 2001, when it lowered it from $75 per share to $45 per share, even though Martin had been urging a reduction since January 2001 and Kiggen had agreed. Significantly, CSFB reduced its numbers only after AOL had done so itself.

### C. *Defendants' Knowledge of "Accounting Gimmickry," Layoffs, and an Investigation at AOL*

In early March 2001, Martin sent an e-mail to Kiggen in which she expressed her belief that certain of AOL's Time Warner divisions would not meet CSFB's forecasted numbers without "accounting gimmickry."[3] She further alerted Kiggen that the

---

**3.** Specifically, Martin stated that she believed "AOL [would] not hit the guidance given us for film, cable nets, and music for 2001 ... at least not without accounting gimmickry."

CEO of Turner Broadcasting was leaving AOL "because he objects to the value destroying things they are doing to the cable networks," that his replacement "doesn't have a clue about the cable network business," and that AOL was "still deferring expensive programming (which destroys asset value) ... just to meet the numbers." None of this information about questionable accounting practices was disclosed in CSFB's research reports.

In July 2001, a CSFB analyst alerted Kiggen to even more negative information about AOL. In e-mails dated July 10 and 11, the analyst informed Kiggen that, according to "a source at AOL," the company had a layoff that "was medium in terms of severity and [would] not be announced publicly." The analyst further stated, "I wasn't aware that AOL was under investigation and has suspended some employees for inappropriate accounting activities—some deals booked inappropriately inflated revenue. Also some employees have been accused of trading irregularities, namely shorting some partner stocks." The Defendants failed to disclose to the public any of this information. CSFB did disclose a 1700–person head count reduction in the America Online division, but not until August 22, 2001, after *AOL* had publicly announced the layoff.

### D. *Revelations About AOL*

On January 30, 2002, CSFB issued the last research report on AOL during the Class Period.[4] Although AOL stock was trading at $26.70 per share, the report contained a twelve-month price target of $45 per share and, like all of the other reports that CSFB had issued on AOL during the Class Period, recommended the stock to investors as a "buy." Despite

"years of extensive coverage," CSFB would not issue another report on AOL and would not withdraw its "buy" recommendation until more than seven months later.

On July 18 and 19, 2002, two articles were published in *The Washington Post* that, according to plaintiff, confirmed what defendants had known, but hid, since the beginning of the Class Period, that AOL had engaged in accounting gimmickry and had been artificially inflating its numbers all along. According to the articles, AOL did so to cover up a material downturn in advertising revenue. The articles tell a story of AOL's increasingly unsuccessful efforts to produce online advertising revenue and the questionable accounting practices that occurred as a result, both prior to and subsequent to the merger with Time Warner. (*See* Exhibits 1 and 2 to Affidavit of Lawrence J. Portnoy in Support of Defendants' Motion to Dismiss the Complaint (document # 96) ("Defs.' Ex. 2")).[5] For example, the July 18, 2002, article revealed:

> AOL converted legal disputes into ad deals. It negotiated a shift in revenue from one division to another, bolstering its online business. It sold ads on behalf of online auction giant eBay Inc., booking the sale of eBay's ads as AOL's own revenue. AOL bartered ads for computer equipment in a deal with Sun Microsystems Inc. AOL counted stock rights as ad and commerce revenue in a deal with a Las Vegas firm called PurchasePro.com Inc.

In reaction to the information revealed by *The Washington Post*, the price of AOL stock declined nearly 12% from its July 17,

---

4. By January 30, 2002, Martin "had been forced out of CSFB" and Kiggen had announced his retirement effective at the end of February 2002. (Compl.¶ 107).

5. Since these articles are identified and quoted in part in the Complaint, it is appropriate for the court to consider them in their entirety.

2002, close of $13.11 to close on July 19, 2002, at $11.58 per share.

Subsequently, on July 24, 2002, the last day of the Class Period, AOL acknowledged that the Securities and Exchange Commission ("SEC") was investigating accounting practices related to its advertising revenue. On July 25, 2002, *The Washington Post* reported on AOL's disclosure, and AOL further disclosed that the SEC had launched a civil investigation into its accounting practices. In reaction to these events, AOL's stock price declined even further from a July 24, 2002, closing price of $11.40 per share to a close on July 25, 2002, of $9.64 per share, a decline of more than 15% on unusually high volume. The Plaintiff further alleges that only after the existence of the SEC investigation regarding the improper recognition of AOL advertising revenue was revealed by AOL did AOL's improper conduct and its effect become clear to the marketplace.

By July 31, 2002, the Department of Justice had initiated a criminal investigation into AOL's accounting practices, and on October 23, 2002, AOL announced that its financial results for each of the fiscal quarters ended September 30, 2000, through June 30, 2002, were incorrect and would need to be restated. For AOL, the impact of the adjustments reduced advertising and commerce revenues by $190 million. Finally, on March 28, 2003, AOL disclosed that it may have to restate hundreds of millions of dollars in revenue as a result of transactions with Bertelsmann AG that were part of the SEC's investigation, and admitted that additional restatements of its previously issued financial statements might be necessary as a result of government investigations.

CSFB did resume coverage of AOL, but not until September 3, 2002, nearly two months after the end of the Class Period. By that time, both Martin and Kiggen had left. The September 3 report stated that CSFB was "initiating coverage on AOL Time Warner" and that the stock was not rated. In contrast to the steady stream of positive analyst reports during the Class Period, CSFB's September 3 report admitted that "[AOL] has been besieged since the merger with bad news, including significantly lowered growth expectations, management turnover, government investigations of accounting practices, and a strategic crisis as the engine of the future (AOL) has ground to a halt."

## IV. DISCUSSION

Rule 10(b) of the Securities Exchange Act of 1934 prohibits the "use or employ[ment of] ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. 78j(b). Commission Rule 10b–5, promulgated under Section 10(b), "forbids, among other things, the making of any 'untrue statement of material fact' or the omission of any material fact 'necessary in order to make the statements made ... not misleading.'" *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 341, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). Courts have used these rules to imply a private damages action that resembles, but is not wholly coterminous with, common law tort actions for misrepresentation. *See id.* When such cases involve publicly traded securities, the action is comprised of the following elements:

(1) a material misrepresentation (or omission);

(2) scienter, i.e., a wrongful state of mind;

(3) a connection with the purchase or sale of a security;

(4) reliance, often referred to in cases involving public securities markets

(fraud-on-the-market cases) as "transaction causation;"

(5) economic loss, and

(6) "loss causation," i.e., a causal connection between the material misrepresentation and the loss.

*Id.* Here the parties dispute elements one, four, and six.

Specifically, defendants Credit Suisse Securities (USA) LLC, Credit Suisse (USA), Inc., Jamie Kiggen and Laura Martin have moved to dismiss the Second Amended Complaint on three grounds: 1) The complaint fails to adequately plead loss causation; 2) the complaint fails to adequately plead transaction causation; and 3) the complaint's allegations that the facts CSFB failed to disclose, accounting irregularities and layoffs at AOL, do not comprise materially false or misleading statements or omissions. Additionally, defendants Frank Quattrone and Elliott Rogers have moved to dismiss Count II, alleging that the complaint failed to adequately plead a control person violation.

 Defendants emphasize, both in their briefs and in oral argument, that this is not an archetypical 10b–5 action. Most 10b–5 actions are not brought against analysts and brokerages, but against the issuers of securities. According to defendants, this distinction is an important one and implies that plaintiffs stand on questionable legal ground. Defendants also assert that 10b–5 *analyst* cases require a narrower construction of the traditional 10b–5 elements. As described below, I disagree.

Although 10(b) may not have been crafted with analysts in mind, Congressional intent,[6] public policy concerns [7] and current case law [8] all militate in favor of applying 10(b) to actions against securities analysts in the same manner as to companies. With respect to Congressional intent, the 10b–5 right of action was not included in the original legislation, so courts must "attempt to infer how the 1934 Congress would have addressed the issue had the 10b–5 action been included as an express provision of the 1934 Act." *Musick, Peeler, & Garrett v. Employers Ins. of Wausau*, 508 U.S. 286, 294, 113 S.Ct. 2085, 124 L.Ed.2d 194 (1993). *See also Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 173, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) (same). The legislative history of the Exchange Act makes clear that one of Congress's primary concerns when crafting 10(b) was "[i]nformation disparity and the resulting disparity in abilit[y] to capitalize on the available information." Nowicki, *supra* note 5, at 1311. Analyst fraud presents one modern instantiation of this fear, particularly where analysts allegedly exploit their informational advantages for personal or corporate benefit at the expense of the investing public.

Additionally, the Exchange Act "embrace[d] 'a fundamental purpose ... to substitute a philosophy of full disclosure for the philosophy of caveat emptor.'" *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972) (quoting *SEC v. Capital Gains Research Bureau*, 375 U.S. 180, 186, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963)). *See also Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Holding analysts fully liable

---

6. *See* Elizabeth A. Nowicki, *A Response to Professor John Coffee: Analyst Liability Under Section 10(b) of the Securities Exchange Act of 1934*, 72 U. Cin. L.R. 1305, 1310–12 (2004).

7. *See id.* at 1312–14.

8. *See, e.g., In re Credit Suisse First Boston Corp.*, 431 F.3d 36 (1st Cir.2005); *Lentell v. Merrill Lynch & Co. Inc.*, 396 F.3d 161 (2d Cir.2005); *DeMarco v. Robertson Stephens, Inc.*, 318 F.Supp.2d 110 (S.D.N.Y.2004); *DeMarco v. Lehman Bros. Inc.*, 309 F.Supp.2d 631 (S.D.N.Y.2004).

under 10b–5 advances these goals, providing investors with more disclosure, protecting investors against fraud, and promoting ethical standards of honesty and fair dealing in the same way that holding corporations liable does.

Extending 10b–5 to analysts also promotes and restores investor confidence. Congress recognized that "the very stability of society [requires] that its rules of law and of business practice recognize and protect ... ordinary citizen's dependant position." S.Rep. No. 73–792, at 5 (1934). Congress added that unless the law extends to guarantee

> " 'straight shooting' [in the market] ... [the] easy liquidity of resources in which wealth is invested is a danger rather than a prop to the stability of that system. When everything one owns can be sold at once, there must be confidence not to sell. Just in proportion as it becomes more liquid and complicated, an economic system must become more moderate, more honest, and more justifiably self-trusting."

*Id.* Given the increased public participation in the stock market over the past 70 years, and the recent rash of accounting and analyst scandals, maintaining public confidence in the market is just as important today as it was in 1934.

Nevertheless, defendants contend that as a general matter, there are compelling reasons to treat analysts differently from the issuers of securities. Specifically, defendants argue that analyst reports can not truly "cause" losses in the same way

that a companies statements would. In addition, subjecting analysts to liability for 10b–5 violations would chill other analysts from writing reports, lest they be vulnerable to suit if the information is later proven to be incorrect. This "chilling effect" would also deprive the market of a valuable source of information.

With respect to defendants' loss causation argument, I am not persuaded that the impact of *analyst reports* on stock prices is so distinct from the impact of a *company's* statements as to justify a different approach. When AOL issues statements that misrepresent its financial position, its stock will tend to artificially increase (or, in the case of omissions of bad news, maintain) its value. Investors rely on those assertions and buy AOL stock. The investors are harmed when the earlier statements are discredited or revealed to be untenable.

In much the same way, if an analyst— especially a respected analyst with a strong track record—forcefully touts a stock, the stock will generally increase in value. In addition, analogous to the AOL example above, omitting unfavorable news will only maintain stock value, not increase it. Investors who purchase the stock at an inflated price are then harmed when the inaccuracy of the earlier recommendations is revealed and the stock price falls. While the additive influence of an analysts' recommendation may not match the additive influence of a company's statements or fraudulent acts,[9] this question relates only to the extent of damages caused, not to

---

9. There are many reasons why this may be true. For instance, analysts do not, in theory, have access to the same insider information that companies possess. Their reports are, therefore, less authoritative. Analysts also have less power to perpetrate major fraud than companies do. For instance, AOL can credibly withhold relevant numbers from the entire marketplace, thus making their financial statements look much more favorable than they really are. Analysts do not have the same sort of monopoly power over proprietary information and its dissemination. Finally, analysts tend to be one of many voices about a company. Thus, any one analyst's impact on a stock is muted by the conflicting information issuing from other analysts. There is no analogous sea of voices capable of muting AOL's own statements.

whether damages have, in fact, been caused.

Defendants' argument on the "chilling" of analyst speech is important but overstated. Quite simply, analysts who have made poor predictions in good faith have nothing to fear. Section 10(b) targets only "intentional or willful conduct designed to deceive or defraud investors." *Ernst & Ernst*, 425 U.S. at 199, 96 S.Ct. 1375. Moreover, the PSLRA requires that a complaint "state with particularity facts that give rise to a 'strong inference' of scienter, rather than merely a reasonable inference." *In re Cabletron Sys., Inc.*, 311 F.3d at 28. The PSLRA's "strong inference" pleading requirement should provide more than adequate protection to analysts.

### A. *Loss Causation*

Defendants have moved to dismiss on two loss causation grounds, which, they argue, mirror the two prongs of the test articulated in *Lentell v. Merrill Lynch Co.*, 396 F.3d 161 (2d Cir.2005). First, defendants argue that no disclosures ever revealed to the market that defendants' predictions were knowingly false, i.e., not just that the information was false or misleading, but that they knew it to be so. Second, defendants argue that nothing was "concealed" from plaintiff because the advertising risk that plaintiff claims was omitted from the analyst reports was, in fact, continuously disclosed throughout the class period.

### 1. *Legal Standard*

■ The two parties disagree as to what the appropriate legal standard for loss causation is. Plaintiff argues that it only needs to satisfy the standard articulated in the Supreme Court's recent securities decision, *Dura Pharmaceuticals Inc. v. Broudo*, 544 U.S. 336, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). Defendants agree that *Dura* controls, but argue that *Dura* is too vague to give adequate guidance here. According to Defendants, the Court should instead look to *Lentell*, a Second Circuit case decided a few months prior to *Dura*. Defendants argue that *Lentell* is not only consistent with *Dura*, it provides more guidance for cases involving allegations of loss causation by third-party analysts. Plaintiff disputes the notion that *Lentell* applies in the First Circuit. The First Circuit has not spoken on this issue.

Defendants are correct that the *Dura* opinion was limited in its scope. The *Dura* court's attention was focused on the specific question of whether loss causation could be adequately pled by alleging *only* that a stock's price had been artificially inflated—a position taken by the Ninth Circuit—or whether some degree of proximate causation for the later loss must also be pled—a position taken by every other circuit court. The Court did not dwell on the specific pleadings requirements because the plaintiff in *Dura* essentially said no more than " 'In reliance on the integrity of the market', [the plaintiffs] ... paid artificially inflated prices for securities and the plaintiffs suffered 'damage[s]' thereby." *Dura*, 544 U.S. at 339–40, 125 S.Ct. 1627. This, the Court said, was insufficient: "[A] plaintiff [must] prove that the defendant's misrepresentation ... proximately caused the plaintiff's economic loss." *Id.* at 346, 125 S.Ct. 1627.[10] Although the Court made clear that it "need not, and d[id] not[ ] consider other proximate cause or loss-related questions," *id.*, and did not go into any other detail, the *Dura* decision remains helpful for two reasons. It confirmed that the touchstone of loss causation analysis is a proximate cause inquiry. And, at the same time, it reaffirmed the notion that the loss causa-

---

**10.** The opinion seems to consider proximate causation in this context as a loss resulting from a "relevant truth" leaking into the market. *Dura*, 544 U.S. at 342, 125 S.Ct. 1627.

tion pleading requirements should be interpreted so as not to impose a significant burden on plaintiffs.

As the Court explained, "ordinary pleading rules are not meant to impose a great burden upon a plaintiff," *id.* at 347, 125 S.Ct. 1627, and "the Federal Rules of Civil Procedure require only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Id.* at 346, 125 S.Ct. 1627 (quoting Fed.R.Civ.P. 8(a)(2)). Furthermore, the Court made clear that neither "the Rules nor the securities statutes impose any special further requirement in respect to the pleading of proximate causation or economic loss." *Id.* In other words, the Plaintiff needs only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Id.* at 347, 125 S.Ct. 1627. *See also Brumbaugh v. Wave Sys. Corp.*, 416 F.Supp.2d 239, 256 (D.Mass.2006) ("[I]n light of *Dura's* acknowledgment that Fed.R.Civ.P. 8(a)(2) applies to the pleading of economic loss and proximate causation, this court must conclude that Plaintiffs have furnished Defendants 'with some indication of [their] loss and the causal connection that [they have] in mind.'") The Court's reading is also consistent with the PSLRA, which was intended to discourage " 'the routine filing of lawsuits . . . with only a faint hope that the discovery process might lead eventually to some plausible cause of action,'" *Dura*, 544 U.S. at 347, 125 S.Ct. 1627 (quoting H.R. Conf. Rep. No. 104–369, p. 31 (1995), U.S.Code Cong. & Admin. News 1995, pp. 679, 730), but not to create unnecessary obstacles for plaintiffs with legitimate claims.

The Second Circuit has echoed the *Dura* theory of loss causation, tying that concept to proximate cause. *See, e.g., Lentell,* 396 F.3d at 172; *Emergent Capital Investment Mgmt., LLC v. Stonepath Group, Inc.,* 343 F.3d 189, 197 (2d Cir.2003); *Suez Equity Investors, LP v. Toronto–Dominion Bank,* 250 F.3d 87, 96 (2d Cir.2001); *Citibank, N.A. v. K–H Corp.,* 968 F.2d 1489, 1495 (2d Cir.1992). As such, "[t]he loss causation inquiry typically examines how directly the subject of the fraudulent statement caused the loss, and whether the resulting loss was a foreseeable outcome of the fraudulent statement." *Suez Equity Investors, LP,* 250 F.3d at 96 (citations omitted). *See also Castellano v. Young & Rubicam, Inc.,* 257 F.3d 171, 186 (2d Cir.2001) ("[T]he damages suffered by plaintiff must be a foreseeable consequence of any misrepresentation or material omission.").

Of course, as the cases note, intervening events can break the causal chain, but this is a factual matter not appropriate for a 12(b)(6) motion to dismiss. *See Emergent Capital Investment Mgmt., LLC,* 343 F.3d at 197.

*Lentell* falls within this paradigm, linking loss causation with proximate cause. *Lentell,* 396 F.3d at 172–73. But the *Lentell* court found the tort analogy to be imperfect. The Court noted, "it cannot ordinarily be said that a drop in the value of a security is 'caused' by the misstatements or omissions made about it, as opposed to the underlying circumstance that is concealed or misstated." *Id.* at 173. Thus, *Lentell* requires plaintiffs to allege that it was the *subject* of the omission or fraudulent statement that caused the actual loss.[11] *Id.* Unless the loss is caused by a

---

11. Though it is not technically necessary to decide this case as the result here will be the same, whether or not the Second Circuit's "subject" requirement is adopted, I want to point out a potential concern with the rule: It is not at all clear that a loss, for which defen-

dants are responsible, could not be caused by a disclosure unrelated to the initial misrepresentation. Consider, for example, a scenario in which an analyst fraudulently understated the extent of "X" risk to Acme Company in a public analyst report. The market, which had

disclosure that reveals something about the fraudulent misstatement or omission, the loss cannot be considered truly foreseeable.[12] *Id.* If it is not foreseeable, then it cannot satisfy the requirements of loss causation.

*Lentell* explained that there are two ways in which the subject of a misrepresentation (or omission) can cause a loss for the purposes of successfully pleading loss causation. *Id.* at 175. First, the dishonesty of the speaker's opinion can itself be leaked to the market. For instance, the market could be informed that an analyst had never believed the projections he made, thus leading to a decline in market value of the stock about which the analyst had lied. Second, the defendant could have concealed or misstated a risk that ultimately caused the loss after a correc-

tive disclosure is made. For example, the analyst could have withheld information suggesting that a new product might not receive FDA approval. When the product did, in fact, fail to receive approval, the value of the stock would decline, injuring stock owners.[13]

### 2. *Concealed or Misstated Risks*

■ Because it is undisputed that knowledge of the CSFB analysts' alleged dishonesty never leaked to the market, I will focus only on *Lentell's* second loss causation paradigm: that defendants "concealed or misstated [ ] risks associated with an investment in [the relevant stock], some of which presumably caused plaintiffs' loss." *Lentell,* 396 F.3d at 175. In the instant case, plaintiff alleges that CSFB concealed or misstated the risk that a weakening advertising market posed to AOL's financial status.[14]

previously believed "X" risk was of greater concern, responded by driving Acme's price from $20 to $22. Now, consider the possibility that a new financial risk to Acme Company was revealed to the market. After learning of the new risk, the market revised its view of the underlying financial health of Acme. With its new, more pessimistic view of the company, the market drove Acme stock down $4/share to $18. Included in this $4 drop could be part or all of the $2 inflation. Thus, an analyst could cause an investor's loss—here an investor could have purchased Acme at $22, sold at $18 and lost all or part of her $2 because of the analyst's misrepresentation—even when the triggering disclosure was unrelated to the subject of the omission or misstatement. Whether or not the loss was, in fact, caused by the disclosure would be an issue for the trier of fact and not a matter of law appropriate for resolution on a 12(b)(6) motion to dismiss.

**12.** The Second Circuit's views to the contrary, it is not immediately apparent that an analyst could not reasonably foresee the risk that his misrepresentation could later cause a loss when a different financial risk was revealed. The real proximate cause concern may be much simpler: that the drop in stock price does not eliminate the artificial inflation from the price. In other words, the stock price has

fallen, but remains artificially high to the same degree that it was before (i.e. it was still overpriced by $10, even though the price had dropped). In this scenario, the original misrepresentation is not a cause-in-fact of the eventual decrease.

**13.** District courts that have interpreted *Lentell* occasionally ignore the substance of the second step, focusing only on the possibility, which is far more remote, that the market would learn of, and respond to, an analyst's active deceit. *See, e.g., Joffee v. Lehman Bros. Inc.,* 410 F.Supp.2d 187, 193 (S.D.N.Y.2006) ("[T]o plead that such statements of opinion actually caused Plaintiffs' damages, it is critical for Plaintiffs to allege that ... the alleged dishonesty of the opinions[ ] is revealed to the market."); *Swack v. Lehman Bros., Inc.,* No. 03–10907–NMG, slip op. at 8 (D.Mass. Aug. 17, 2005) ("Plaintiffs have not alleged that the 'relevant truth' about Lehman's recommendations (i.e. that they were dishonest) became known.")

**14.** This focus on *Lentell* is not intended to imply that I believe *Lentell* is binding precedent in the First Circuit. Because I find that Plaintiff's claims survive even the loss causation standard articulated in *Lentell,* it is unnecessary to discuss other grounds on which the claim could survive.

Defendants argue that this assertion is inadequate for two reasons. First, defendants argue that CSFB never concealed the risk that the advertising decline posed to AOL, and that, on the contrary, CSFB continuously disclosed this information throughout the class period. Second, they argue that the market was independently aware of this risk and thus, any failure to disclose by defendants could not have caused plaintiff's losses.

In support of their first argument, Defendants assert that they disclosed the weakness and deterioration of the advertising market, "and frankly acknowledged that reduced advertising spending posed a real risk to AOL's financial performance" in at least ten different research reports cited by plaintiff in the Second Amended Complaint. For example, an AOL report from April 3, 2001, states, "[o]ur [EBITDA] estimate of $10.9B ... does assume some stabilization in the decline in advertiser and consumer spending in [the second half of 2001]." (Portnoy Aff. Ex. 24, at 1). An April 16, 2001, report makes a similar statement, adding, "the quality of [AOL's] earnings ... will be an important issue to monitor" and "AOL will clearly need to address the low [second half] visibility on its earning call." (*Id.* Ex. 27, at 1). An earlier CSFB report from February 13, 2001,[15] made the generic statement that "[h]ampered by ... slowed demand for online advertising, even the strongest names in our universe face challenges in monetizing traffic during Q4'00," a situation that appears "likely to extend through at least the first half of 2001." (*Id.* Ex. 17, at 1.) Various reports also included vague disclosures about AOL, such as a February 1, 2001, report stating "[w]e are monitoring several risks/issues going forward," including "revenue and earnings visibility [and] earnings quality." (*Id.* Ex. 16, at 1).

Defendants also cite to a number of articles that discussed the uncertainty of the advertising market during the class period. For instance, one July 2002 *Washington Post* article excerpted in the Complaint observed that "[q]uestions about ad revenue began to emerge on Wall Street just as AOL sought to complete its Time Warner merger" in January 2001. *See* Compl.¶ 116. Defendants also assert that a Westlaw search of *Wall Street Journal* articles from 2001 yielded more than 150 articles referring to the weak advertising market.

Having provided the Court with this "exculpatory evidence," Defendants rely on *Lentell* to argue that their disclosures impose a burden on Plaintiff that cannot be met. They cite *Lentell* for the proposition that,

> where ... substantial indicia of the risk that materialized are unambiguously apparent on the face of the disclosures alleged to conceal the very same risk, a plaintiff must allege (i) facts sufficient to support an inference that it was defendant's fraud-rather than other salient factors-that proximately caused plaintiff's loss; or (ii) facts sufficient to apportion the losses between the disclosed and concealed portions of the risk that ultimately destroyed an investment.

*Lentell,* 396 F.3d at 177; *cf City of Sterling Heights Police & Fire Retirement Sys. v. Abbey National,* PLC, 423 F.Supp.2d 348, 362 (S.D.N.Y.2006) (requiring that "specific and unambiguous" indicia of risk appear on the face of defendant's disclosures). Defendants also cite *Baron v. Smith,* 380 F.3d 49 (1st Cir.2004), for the proposition that "[i]t is not a material omission to fail to point out information of which the market is already aware." *Id.* at 57. The question, then, is whether the risks that allegedly materialized to cause

---

**15.** This report was omitted from Plaintiff's complaint, but provided by Defendants.

Plaintiff's losses were "unambiguously apparent on the face of the disclosures" or "information of which the market [was] already aware."

Defendants gloss over the factual differences between the instant case and the facts presented to the Court in *Lentell.* In *Lentell,* the plaintiff claimed that the "buy" and "accumulate" ratings issued by Merrill Lynch for 24/7 Media and Interliant were false and misleading. Throughout the class period, Merrill Lynch rated the companies as either "buy" or "accumulate," the two highest ratings.[16] Merrill also rated investments on a four-point scale from A (low risk) to D (high risk). *See Lentell,* 396 F.3d at 176. Throughout the class period, both 24/7 and Interliant were rated as "D" investments, the riskiest label dispensed by Merrill. The allegedly fraudulent "buy" and "accumulate" ratings appeared in the "Investment Opinion" section of Merrill analyst reports. Also housed in this section was an "Investment Risk Rating," which includes the A–D rating of risk. Thus, the Second Circuit concluded, "the high-risk nature of the investment in 24/7 Media and Interliant was available to the marketplace just as readily as Merrill's Appreciation Potential [the 'buy' or 'accumulate'] Ratings . . ." *Id.* at 176.

Unlike the disclosures provided in *Lentell,* there is nothing either "specific" or "unambiguous" about the purported disclosures in this case. The relevant truth that CSFB allegedly concealed was the impact of the advertising market on AOL's financial status. While some of the "disclosures" cited by Defendants suggest a certain degree of vulnerability to a weakening advertising market, these disclosures were neither specific nor unambiguous. (For one thing, the reports failed to disclose the negative impact of the advertising down-

turn on AOL stock that CSFB's own analysts believed was inevitable.) Generic statements regarding the overall strength of the advertising market cannot reasonably be considered specific and unambiguous disclosures of the risk known to the CSFB analysts.

Defendants' position becomes even more untenable when these statements are viewed alongside other, more positive remarks from the CSFB analyst reports. For instance, a May 22, 2001, analyst report raised both revenue and EBITDA estimates for AOL, by $200 million and $100 million respectively. This upward revision occurred *after* internal discussion among AOL analysts that the weakening advertising market would have an adverse impact on AOL. The upward revision on May 22 also casts the April 16 "disclosures" cited by Defendants, that "the quality of AOL's earnings . . . will be an important issue to monitor" and "AOL will clearly need to address the low [second half] visibility on its earning call," in a very different light. Given that CSFB followed its "warnings" by *raising* earnings estimates the very next month, its supposedly cautionary language can hardly be read as an unambiguous indicia of risk.

Moreover, AOL made other positive remarks about the quality of AOL's financial position that further undermined the alleged disclosures. On May 23, 2001, Defendants represented that "the stock should continue to trend up in the near-term as investors who are underweighted (the stock remains under-owned institutionally) grow more comfortable with AOL's targets this year." (Complaint ¶ 57). On June 25, 2001, CSFB issued a report entitled, "AOL June Q Preview: Cash Flow Good, Revenue Light; Adjust-

---

**16.** Merrill Lynch uses a six-step rating system. These are the two highest of the six possible ratings.

ing Top Line Estimates." In the report, CSFB revised its earlier revenue estimates downward, but did not adjust its EBITDA estimates. Instead, they maintained their $11 million EBITDA projection and even suggested that an "upside of $100–200 million [is] possible." (Complaint ¶ 64). A month later, they published a report representing that a "firming ad market" would "drive growth" in the second half of 2001. (Complaint ¶ 74). Because the messages included in AOL's reports are so conflicting (if not weighted entirely towards the optimistic end of the spectrum), it is difficult to see any of CSFB's alleged disclosures as sufficiently unambiguous or specific to trigger the additional pleading requirements outlined in *Lentell*.[17]

The next question is whether, in any event, the supposedly corrective information about a weakening advertising market was something of which the market was already aware. Defendants make that assertion in their memoranda. It may well be true. It is also somewhat beside the point. The issue is whether the market was aware of the risk that the weakening advertising market posed to AOL's earnings potential. As an initial matter, this is a factual issue more suited to summary judgment. Second, Defendants have not submitted anything that suggests, much less establishes with any specificity, that the market was well aware that AOL would fail to hit its earnings targets because of the softening advertising market.

In fact, this argument also buttresses Plaintiff's position. The fact that CSFB persisted in providing bullish projections for AOL despite the existence of a weakening advertising market that had led "EVERY competitor that operates in these segments [to] miss[ ] or revise[ ] down dramatically compared with Jan. 1, 2001 estimates," (Complaint ¶ 85), actually suggests a *stronger* vote of confidence than one given in normal conditions.

Accordingly, I conclude that Plaintiff's have adequately pled that CSFB failed to disclose the shaky financial status of AOL, and further, the market was not aware of this risk. Therefore, I **DENY** Defendants' motions to dismiss for failure to plead loss causation.

### B. *Transaction Causation*

Defendants next allege that the Second Amended Complaint should be dismissed because Plaintiff has failed to adequately plead transaction causation. Specifically, Defendants argue that transaction causation is established by pleading artificial inflation and that Plaintiff has failed to do so. This argument does not persuade for two reasons. First, it ignores the body of case law which suggests that, having pled fraud on the market, plaintiff is entitled to a rebuttable presumption of reliance. Second, Plaintiff has already pled artificial inflation. Plaintiff needs to provide more factual support for its artificial inflation claim in order to ultimately succeed, but

---

**17.** Defendants' disclosure arguments are similar to arguments that were reflected by the Southern District of New York in *DeMarco v. Lehman Bros.*, 309 F.Supp.2d 631 (S.D.N.Y. 2004). In that case, the judge wrote,

[Defendant] argues that since the texts of the research reports contain some language skeptical of RealNetworks' value, the public was adequately informed of the risks involved. But the very fact that, notwithstanding the skeptical language, the reports gave RealNetworks the highest possible "buy" rating is tantamount to a statement

that the reader of the reports should discount the skeptical language—a materially misleading statement in light of what [the analyst] actually knew and believed, as indicated by the emails. At the very least, it is a question for the jury.

*Id.* at 634. Similarly, the fact that CSFB continued to publish bullish projections and include optimistic assessments of AOL's financial position is akin to a statement that the reader need not worry much about the generic risk disclosures that appeared from time to time.

this factual showing is not an appropriate question for a motion to dismiss.

### 1. *Legal Standard*

 Transaction causation is akin to reliance. *See, e.g., Dura,* 544 U.S. at 341, 125 S.Ct. 1627; *Lentell,* 396 F.3d at 172. "It is established simply by showing that, but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction." *Emergent Capital Inv. Mgmt.,* 343 F.3d at 197. To appropriately allege transaction causation, Plaintiff need not allege that it read CSFB's analyst reports, nor does Plaintiff need to assert that it purchased AOL through CSFB. Instead, Plaintiff may allege that Defendants perpetrated a fraud-on-the-market. *See Basic Inc. v. Levinson,* 485 U.S. 224, 247, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988).

The fraud-on-the-market theory grows out of the efficient market hypothesis. That hypothesis relates to reliance in the following way:

> The fraud-on-the-market presumption of reliance and its relationship to market efficiency can [ ] be reduced to the following syllogism: (a) an investor buys or sells stock in reliance on the integrity of the market price; (b) publicly available information, including material misrepresentations, is reflected in the market price; and therefore, (c) the investor buys or sells stock in reliance on material misrepresentations.

*In re: PolyMedica Corp. Secs. Litig.,* 432 F.3d 1, 8 (1st Cir.2005). *See also Basic, Inc.,* 485 U.S. at 247, 108 S.Ct. 978. Of course, for this syllogism to hold, the market must be efficient; otherwise there can be no presumption that the information has been immediately impacted into the stock price.[18]

 Plaintiff may establish a rebuttable presumption of reliance under the fraud-on-the-market theory even when it is unaware of the fraud. *Catton v. Defense Technology Systems, Inc.,* 2006 WL 27470, *5 (S.D.N.Y.2006); *In re GeoPharma, Inc. Secs. Litig.,* 399 F.Supp.2d 432, 443 n. 86 (S.D.N.Y.2005). In fact, Plaintiff can fulfill the transaction causation pleading requirements merely by alleging that Defendants perpetrated a fraud-on-the-market or made a material omission. *See In re eSpeed, Inc. Securities Litig.,* 2006 WL 880045, *9 n. 137 (S.D.N.Y.2006) (fraud-on-the-market); *In re Parmalat Secs. Litig.,* 375 F.Supp.2d 278, 303 (S.D.N.Y.2005) (material omission).

 Assuming Plaintiff has adequately established their rebuttable presumption,

> A defendant may [still] rebut the fraud on the market presumption by showing that it made no material misrepresentations because the alleged misrepresentations were already known to the market—a so-called 'truth on the market' defense. 'However, the corrective information must be conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements.' As the Court of Appeals has noted, '[t]he truth on the market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality.'

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.,* 2005 WL 2148919, *6 (S.D.N.Y.2005) (citations omitted).

To be sure, there has been some debate regarding the applicability of the fraud-on-

---

**18.** Market efficiency is not, however, an appropriate inquiry for a motion to dismiss.

*See, e.g., DeMarco,* 318 F.Supp.2d at 120–21.

the-market presumption to analyst cases, albeit in a different context, namely, class certification pursuant to Fed.R.Civ.P. 23. *See, e.g., Hevesi v. Citigroup Inc.,* 366 F.3d 70, 77 (2d Cir.2004) (granting petition for interlocutory appeal to review this "novel question"); *Fogarazzo v. Lehman Bros. Inc.,* 232 F.R.D. 176, 185 (S.D.N.Y.2005) (holding that plaintiffs need not offer evidence that analyst reports actually distorted market price because it is a question of fact); *DeMarco v. Lehman Bros. Inc.,* 222 F.R.D. 243, 247 (S.D.N.Y.2004) (requiring plaintiffs to make a prima facie showing that analyst reports materially and measurably impacted market price of stock).[19] And in that setting, courts have invoked the fraud-on-the-market presumption to reject motions to dismiss complaints, even against analysts. *See, e.g., Teamsters Local 445 Freight Div. Pension Fund,* 2005 WL 2148919 at *6; *DeMarco v. Robertson Stephens, Inc.,* 318 F.Supp.2d 110, 119–20 (S.D.N.Y.2004); *In re Credit Suisse First Boston Corp. Sec. Litig.,* No. 97 CIV. 4760, 1998 WL 734365, at *8 (S.D.N.Y. Oct.20, 1998). I agree.

■ Although the Supreme Court's opinion in *Basic* addressed false statements made by an issuer and not an analyst, the opinion does not limit the theory to that context. On the contrary, the Court stated that the theory applied to "any public material misrepresentations," *Basic,* 485 U.S. at 247, 108 S.Ct. 978, and that the presumption was "supported by common sense and probability" because "empirical studies have tended to confirm Congress' premise [in adopting the 1934 Securities Act] that the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations." *Id.* at 246, 108 S.Ct. 978. Notably, the opinion makes no reference to the source of the information; the Court's concern is, instead, with the materiality of the information and its impact on the market.

Applying the presumption in the analyst context is a logical extension of the Court's opinion in *Basic.* Much as "common sense and probability" support the presumption for issuers, they support the presumption for analysts.[20]

Analyst reports are written with the purpose and expectation that the market will take heed of their message. The efficient market hypothesis suggests that all relevant information—which, one must assume, includes analyst reports written by "award winning" professionals like Kiggen

---

**19.** The applicability of the presumption has been viewed differently by courts, depending on whether a case is at the motion to dismiss stage or class certification stage, because Fed. R.Civ.P. 23(a) requires more of plaintiff than is necessary to surpass 12(b)(6). *Cf. DeMarco,* 309 F.Supp.2d at 635–36 (holding that presumption is applicable in motion to dismiss context); *DeMarco,* 222 F.R.D. at 247 (Requiring additional showing by plaintiffs at class certification stage *in the same case* ).

**20.** In *DeMarco v. Robertson Stephens, Inc.,* the Court made a similar finding where the defendant had argued that the fraud-on-the-market hypothesis applied only to corporate insiders who possess inside knowledge and not to opinions published in analyst reports.

318 F.Supp.2d at 120. The Court scoffed at this suggestion, stating:

> An underwriter like [defendant] that has a research department engaged in the business of analyzing companies in order to disseminate to the public information and opinions about specific securities clearly intends that the market take into account its recommendations to buy or sell such securities. It is axiomatic that prices in an open market reflect supply and demand, and it is disingenuous, to say the least, for defendants to now argue that their published purchase recommendations are somehow excluded from the information available to market actors when valuing securities. *Id.*

and Martin—is immediately impacted into stock prices. As in *Demarco*, it is disingenuous for CSFB here to claim that their reports did not affect the price of AOL stock. This is especially so at the 12(b)(6) stage. It is unreasonable to require Plaintiff to allege a set of complex facts in support of an inference that can very reasonably be drawn from the basic facts of the situation.[21]

Thus, the fraud-on-the-market presumption applies to analysts for the same reason that it applies to issuers: when investors purchase a stock, the price of which

has been artificially inflated by a fraudulent misrepresentation, the investor has purchased the stock in reliance on that misinformation just as if the misinformation came from an issuer.

### 2. *Analysis*

■ The transaction causation analysis here is straightforward. Plaintiff alleges that Defendants perpetrated a fraud on the market, thereby establishing a rebuttable presumption of reliance. Defendant does not rebut this presumption at this stage.[22] Moreover, Plaintiff has pled arti-

---

**21.** For instance, there is a large body of academic literature suggesting that institutional investors do rely on analyst reports when making decisions and these reports *do* impact stock prices. In the face of this literature, it makes little sense to require a complicated factual showing, at least at the 12(b)(6) stage. *See, e.g.,* T. Clifton Green, *The Value of Client Access to Analyst Recommendations,* 1 (2004) (working paper, Emory Univ.), *available at* http://papers.ssrn.com/sol3/papers.cfm? abstract—id =438725 ("Institutional investors pay significant amounts to obtain real-time access to brokerage firm research ..."); Paul J. Irvine, *Analysts' Forecasts and Brokerage–Firm Trading,* 79 Acct. Rev. 125, 126, 147–48 (2004) (brokerage firm clients including institutional investors increase trading in response to forecast revisions and recommendations from brokerage firm analysts). From an economic perspective, "investors should be willing to pay for brokerage investment advice only if the expected benefit is at least as great as the cost of the advice." Kent L. Womack, *Do Brokerage Analysts' Recommendations Have Investment Value?,* 52 J. Fin 137, 138 (1996). Given the fact that investors do purchase analyst reports, and brokerage houses spend hundreds of millions of dollars each year producing those analyst reports, *see id.,* the market clearly believes that analyst reports provide information material to one's investment decisions.

Empirical studies from a variety of sources have also shown that markets react to the release of analyst reports in a timely and economically significant manner. *See generally* Cristi A. Gleason & Charles M.C. Lee, *Analyst Forecast Revisions and Market Price Formation,* 78 Acct. Rev. 193 (2003); Alon

Brav & Reuven Lehavy, *An Empirical Analysis of Analysts' Target Prices: Short-term Informativeness and Long-term Dynamics,* 58 J. Fin.1933 (2003); Jeffrey A. Busse & T. Clifton Green, *Market Efficiency in Real–Time,* 65 J. Fin. Econ. 415 (2002). The SEC has endorsed a similar position. See Securities and Exchange Commission, *Analyzing Analyst Recommendations* (April 20, 2005), available at http://www.sec.gov/investor/pubs/analysts. htm (noting that "[t]he mere mention of a company by a popular analyst can temporarily cause its stock to rise or fall-even when nothing about the company's prospects or fundamentals has recently changed.").

Other relevant nuggets from the academic literature suggest that the market pays more attention to reports issued by so-called "celebrity" analysts and that the market does not adequately distinguish between reports that have legitimately new information and reports that simply confirm existing information and herd towards an emerging consensus. *See* Gleason & Lee, *supra.* The former observation is relevant in the instant case because of Kiggen and Martin's touted status as "award-winning" analysts, the latter because it suggests that analyst reports have a sort of intrinsic impact on stock prices and do not need to convey "new" information to affect stock prices. This phenomenon makes it even more reasonable to apply the fraud-on-the-market assumption to the analyst context.

**22.** Of course, Defendants can attempt to rebut the presumption by relying on the "truth on the market" defense later in this litigation. The "truth on the market" defense is intensively fact-specific and rarely appropriate for review on a 12(b)(6) motion.

ficial price inflation in its complaint. Thus, even if Defendants' legal position were accurate, it would still be insufficient to merit dismissal.

Rather, Defendants counter by arguing the narrow interpretation of *Lentell* described—and rejected—above, that "[i]n a fraud-on-the-market case, plaintiffs meet their pleading obligation for transaction causation by alleging that the defendants' misstatements caused the share price to be artificially inflated."[23] Def. Mem. at 20. According to Defendants' brief, this requirement, which is in tension with the case law cited above, was announced in *Lentell.* But the Court has carefully examined *Lentell;* there is no such requirement.[24] Defendants also argue that because Plaintiff has not alleged any *facts* to support artificial inflation, it has not met the pleading requirements for transaction causation.[25] Furthermore, Defendants claim that the movement of AOL's stock price on the release dates for each of the thirty-four analyst reports proves that there was no causal connection between the movement of the stock price and the issuance of the analyst reports because the stock price *declined* on eighteen of the thirty-four days (53%). According to Defendants, these results are "less than random" because even by chance one would

expect the stock price to decline only half the time. Additionally, Defendants note that AOL's stock price dropped 1.61% on the day that the first CSFB report was issued.

Defendants' argument does not persuade for two reasons. First, the case law cited by Defendants does not clearly support their argument regarding the movement of AOL's stock price and, to the extent it does, is based on suspect reasoning. Second, Plaintiff *has* pled facts sufficient to support an inference of artificial inflation, assuming such a showing is necessary for the transaction causation test in a motion to dismiss.

Defendants rely on *In re Credit Suisse First Boston,* No. Civ.A.02–12056–GAO, 2005 WL 852455 (D.Mass. Mar.31, 2005) ("*Agilent I* ") to support their artificial inflation argument. As an initial matter, *Agilent I* is not obviously applicable to Defendants' transaction causation position. It addressed the market inflation issue in the context of a pre-*Dura* argument about loss causation, not transaction causation. In any case, I disagree with its reasoning for reasons akin to those voiced in *Swack v. Credit Suisse First Boston,* 383 F.Supp.2d 223 (D.Mass.2004). *Agilent I* stated, "Immediately after the eight 'Buy'

---

**23.** I should note here that Judge Dein already found that artificial inflation had been sufficiently pled (she considered this with respect to loss causation, as seemed appropriate pre-*Dura* ) in the R & R adopted by this Court. Defendants contend that her decision should be reconsidered in light of two recent cases: *In re PolyMedica,* 432 F.3d 1, and *In re Credit Suisse First Boston Corp.,* 2005 WL 852455 (D.Mass.2005). The former case does not address the issue at all. The latter case does address the issue of artificial inflation, but does so in the context of a loss causation inquiry (it was pre-*Dura* ).

**24.** *Lentell* does cite *Dura* for the proposition that the "artificial inflation" theory relates more to *transaction causation* than *loss cau-*

sation. In *Dura,* the Supreme Court overturned the Ninth Circuit's rule that pleading artificial inflation is sufficient to plead loss causation, pointing out not only that a) this position was untenable because it required no showing of loss, but also that b) it was more akin to the concept of transaction causation. But that is all the Court did—explain that artificial inflation was not the appropriate test for loss causation. Tellingly, no federal court has endorsed the position taken by Defendants.

**25.** In support of this proposition, Defendants cite only generic First Circuit case law on the necessity of providing factual assertions in one's pleadings.

reports were issued, the stock traded up four times and down four times. · Perhaps, then, it is possible to say the market was paying attention half the time." *Id.* at *9. According to the court, this sort of ambiguous correlation is insufficient "to support an inference that misleading [research reports] had *any* effect on the price of [an issuer's] stock." *Id.*

In *Swack,* the disputed stock dropped on nine of the sixteen days that the allegedly inflationary analyst reports were issued. Defendants challenged the sufficiency of the causal link between the reports and the stock price's movement, but the court ruled against defendants, explaining:

The market history ... does not lead ineluctably to the conclusion of lack of influence. Stock prices rise and fall for combinations of many different reasons. Defendants' conduct could have tempered a drop in price that would otherwise have occurred, or resulted in a greater increase than the stock would otherwise have enjoyed, absent the deceptive analyst reports. The question for Rule 12(b)(6) purposes is whether Swack must now plead the specific mechanisms by which this occurred, or whether that can await a later stage of the litigation, when she has had a chance to develop expert testimony....

At this stage, my task is to examine the formal sufficiency of the pleadings, not to determine whether there is evidence sufficient to support a jury verdict in plaintiff's favor.

*Swack,* 383 F.Supp.2d at 240–41.

Moreover, AOL's stock fluctuations and their relationship to the reports should be considered in the context of the stock price's general trajectory during the class period. While a stock may be expected to go up half the time and down half the time when its price remains roughly even, this assumption makes little sense in a time such as the class period when a stock is hemorrhaging value. At the start of the class period, AOL stock was trading at $48.05 per share. By the end of the class period it had fallen to $9.64 per share. Of course the stock price went down on most days during the class period. That is what happens when a stock loses nearly 80% of its value in an 18 month period. The fact that AOL's stock price only declined on 53% of the days in question may actually be proof that the reports did have an inflationary impact on AOL stock. And it may also be the case that on the 53% of days that the stock price went down, the decrease was less than on a typical day during the class period. Whatever the truth of the matter is, isolating the myriad causal factors that affect stock price is a factual question that should be decided at trial, with the help of qualified experts. It is not an issue appropriate for a motion to dismiss.

Although Plaintiff has not performed a comprehensive stock price movement analysis, it has plead a number of facts in support of artificial inflation. For instance, Plaintiff alleges that "[e]ach of the Defendants' reports on AOL issued throughout the Class Period significantly and artificially inflated and/or maintained the price of AOL common stock," (Compl.¶ 3), and that defendants' unlawful conduct "was intended to and did ... artificially inflate and maintain the market price of AOL common stock[,] and ... cause Plaintiff and other members of the Class to purchase AOL common stock at artificially inflated prices." (*Id.* at ¶ 132). Defendants Kiggen and Martin were touted as influential analysts who, it could be inferred, were able to positively influence AOL's stock price.

The Complaint also notes that CSFB's EBITDA estimate "is a key source of value-added by [Defendants] to the market," (Compl.¶ 24), that negative analyst reports

might "cancel[ ] out the considerable value ... [CSFB] otherwise bring[s] to the proceedings," (Compl.¶ 47), and that Defendant Kiggen would continue to "filter" negative analysis from defendant Martin "before it gets to investors." (Compl.¶ 50). Taken in the light most favorable to Plaintiff, these comments are clearly sufficient to support an inference of artificial inflation. Any suggestion to the contrary by defendants would make filing complaints nearly impossible.

For all of the aforementioned reasons, I hereby **DENY** Defendants' motion to dismiss on transaction causation grounds.

### C. *Materiality of and Duty to Disclose Accounting Irregularity and Layoff Allegations*

On July 10, 2001, an analyst in CSFB's Tech Group emailed defendant Kiggen and Watters, another CSFB analyst (who is not a defendant). The email revealed that the Tech Group analyst had a source at AOL who had learned of a recent layoff at the company. The analyst added that he was having dinner that night with his source and would attempt to obtain more information. The next morning the analyst emailed Kiggen and Watters again. In this email the analyst wrote that the layoffs would be of "medium" severity and would not be revealed publicly. He also added that AOL was under investigation and had suspended employees for inappropriate accounting activities that inappropriately inflated revenues.

Plaintiff notes that the Defendants published twelve analyst reports containing revenue results and projections after learning of these inappropriate accounting activities and artificially inflated revenues. None of the reports disclosed either of these concerns, or appear to have adjusted their projections to account for potential issues with the financial data they received from AOL.

Defendants claim that Plaintiff's allegations of accounting irregularities and layoffs are immaterial and do not trigger a duty to disclose on the part of CSFB. I disagree.

#### 1. *Materiality*

Defendants contend that the rumored layoffs and accounting irregularities were not material because the rumors were too vague and indefinite to have been important to a reasonable investor at that time. Def. Rep. Mem. at 19. Information is considered material "only if its disclosure would alter the 'total mix' of facts available to the investor and 'if there is a *substantial* likelihood that a reasonable shareholder would consider it important' to the investment decision." *Milton v. Van Dorn Co.,* 961 F.2d 965, 969 (1st Cir.1992) (quoting *Basic,* 485 U.S. at 231–32, 108 S.Ct. 978).

A reasonable investor would not consider the layoff information relevant, argue Defendants, because even if Plaintiff's factual allegations were proven, they would merely establish that in July 2001 "Defendants became aware of an unidentified 'source' at AOL, of unknown title and credibility, who said that somewhere within the vast AOL corporate structure there had been some layoffs of unknown scope or size, and that AOL was under some kind of unspecified investigation and had suspended an unknown number of employees of unknown seniority for inappropriate accounting activities involving inflated revenue." Def. Mem. at 19.

Materiality is rarely appropriate for review on a motion to dismiss. As the First Circuit explained, "[i]n general, the materiality of a statement or omission is a question of fact that should normally be left to a jury rather than resolved by the court on a motion to dismiss. Thus, we review the complaint only to determine that it pleads

the existence of such statements and presents a plausible jury question of materiality." *In re Cabletron Systems, Inc.*, 311 F.3d 11, 34 (1st Cir.2002) (citation omitted).

■ Plaintiff alleges that Defendants knew of layoffs and accounting irregularities at AOL. More significant, these accounting irregularities were the same irregularities exposed by the SEC the following year. Plaintiff need not prove either of these allegations at this stage. The emails it has produced concern activities that may plausibly interest shareholders. Moreover, they make clear that Plaintiff's accusations are not just idle speculation with which it hopes to sneak past the 12(b)(6) censor to find a valid claim in discovery. While Plaintiff may ultimately prove unsuccessful in its attempts, its pleadings offer enough to support a reasonable inference of materiality.

Next, Defendants argue that they are entitled to an inference of materiality as AOL—the party in the best position to assess the materiality of these concerns—did not publicly disclose this information. In short, because the securities laws require companies to disclose the existence of uncertainties and facts that may have a material impact on a company's financial health, *see, e.g.,* Regulation S–K, Item 303, 17 C.F.R. § 229.303; SEC Release No. 34–8995, 3 Fed. Sec. L. Rep. (CCH) ¶ 23, 120A, at 17,095 (Oct. 5, 1970), AOL's failure to disclose the events shows that they were not material concerns.

Apparently, Defendants' logic is that AOL, despite being investigated and later penalized for fraudulent accounting practices, did not publicly release information about layoffs because the company viewed it as immaterial. That is one possible inference, but obviously, there are others.

### 2. *CSFB's Duty To/Not To Disclose*

Defendants also argue that the non-disclosures are not actionable because there was no duty to disclose in this case. Although Defendants acknowledge that CSFB had a duty to make its affirmative statements "complete and accurate," *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 26 (1st Cir.1987), they assert that "this ... does not mean that by revealing one fact about a product, one must reveal all others that, too, would be interesting, market-wise...." *Backman v. Polaroid Corp.*, 910 F.2d 10, 16 (1st Cir.1990). Rather, the speaker must reveal only "such others, if any, that are needed so that what was revealed would not be 'so incomplete as to mislead.'" *Id.*

Plaintiff counters that only those who remain silent are entirely exempted from full disclosure. *See In re WorldCom Inc., Securities Litig.*, 294 F.Supp.2d 392, 427–28 (S.D.N.Y.2003).

> Those who choose to speak ... must speak honestly—not in half-truths, in bad faith, or without a reasonable basis for their statements. When a person speaks, but chooses to omit information, the liability for that omission will be judged by its materiality. [ ] Defendants were in the business of speaking to the public about stock values. They spoke forcefully and frequently about the value of WorldCom. Having spoken, [ ] Defendants may be held accountable for any material omissions in those statements.

*Id.* at 428. Defendants respond that Plaintiff has not challenged any specific statements from the analyst reports that would be rendered misleading by their omissions. Instead, they argue, Plaintiff has only claimed that the analyst reports were misleading in toto, and that this sort of broad sweeping assertion is insufficient to state a claim for relief.

Defendants' argument is inconsistent with both *WorldCom* and common sense. Defendants were in the business of speaking to the public about stock values. Every time they issued a projection for AOL's earnings or stock prices and omitted information material to those projections, their reports were "so incomplete as to mislead." *Backman*, 910 F.2d at 16. Accounting gimmickry and layoffs are just the sort of information that drives stock prices down; by publishing bullish projections that neither disclosed nor included these allegedly material concerns, CSFB may have misled the market. If the omissions are later found to be material, a factual question, best reserved for a later stage of litigation, CSFB will have had a duty to disclose them.

Defendants' second argument is that they were operating under a conflicting duty not to disclose, as mandated by NYSE Rule 435(5). The rule prohibits member firms from "[c]irculat[ing] in any manner rumors of a sensational character which might reasonably be expected to affect market conditions on the Exchange." NYSE Rule 435(5). This argument fails for the same reason as Defendants' previous argument: if CSFB was going to speak about stock prices at all, they needed to do so completely and accurately. And Defendants have provided no cases suggesting otherwise.

For these reasons, I hereby **DENY** Defendants' motion to dismiss on grounds that Plaintiff's complaint fails to plead material omissions or a duty to disclose regarding the layoffs and accounting issues.

### D. *Control Person Liability*

Count II of the Second Amended Complaint alleges that Defendants CSFB, CSFB–USA, Quattrone, and Rogers violated Section 20(a) of the Exchange Act. Quattrone and Rogers have filed separate motions to dismiss. CSFB and CSFB–USA have not filed any motions relating to this Count.

### 1. *Legal Standard*

Section 20(a) provides:

Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person ... unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a)(2000). The term "control" is not defined in the Exchange Act, but in the regulation it is defined as "the possession, direct or indirect, of the power to direct or to cause the direction of the management and policies of [an entity], whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405 (1990).

*Aldridge v. A.T. Cross Corp.*, 284 F.3d 72 (1st Cir.2002) is the case on point. In *Aldridge*, the First Circuit states, "[t]o meet the control element, the alleged controlling person must not only have the general power to control the company, but must also actually exercise control over the company." *Aldridge*, 284 F.3d at 85. The difficulty is in pinning down the meaning of the phrase, "actually exercise control."

The language in *Aldridge* must be viewed in the context of the specific facts presented in that case—facts very different from the case at bar. As the *Aldridge* Court explained:

In this case, the trust defendants have the power to elect two-thirds of the directors. But they have no direct control over the management and operations of the company. At most the evidence pled is that the trust defendants are controlling shareholders. This indicates

some potential ability to control. In the absence of some indicia of the exercise of control over the entity primarily liable, however, that status alone is not enough. Although controlling shareholders own the majority of the shares in a company, they, like any other shareholders, should have the ability to be passive, leaving the management to the directors and officers. *Aldridge*, 284 F.3d at 85. Thus, when the court says, "[u]nless there are facts that indicate that the controlling shareholders were actively participating in the decision making processes of the corporation, no controlling person liability can be imposed," *id.*, it does not seem that the First Circuit means to refer to the corporation's decision making processes. On the contrary, it seems to refer to a defendant's exercising actual control over the general functioning of the company. In other words, what is significant is that it is important that defendants are not passive shareholders—control persons in name only—but exert actual control over the company.

This provision has been interpreted differently by judges in this district. Judge Woodlock attempted to clarify in *Swack*, writing that a "plaintiff must make 'two distinct factual allegations: [1] that the "status" of the controlling entity gave it "general" power over the controlled entity; and [2] that the controlling entity did, in fact, exercise such power.'" *Swack*, 383 F.Supp.2d at 246 (quoting *In re Lernout & Hauspie Secs. Litig.*, 230 F.Supp.2d 152, 175 (D.Mass.2002)). Judge Woodlock used this standard to hold that plaintiff failed to allege that "[defendant] actually exercised control over [the analyst], at least to the extent of controlling the contents of his research reports and/or communications with Dachis. While it might be reasonable to so assume, the PSLRA and Rule 9(b) require more: she must plead it." *Id.*

Meanwhile, Judge Keeton has explained the appropriate test as follows: "[A] control-person relationship exists whenever (i) the alleged control person actually exercised control over the general operations of the primary violator and (ii) the alleged control person possessed-but did not necessarily exercise-the power to determine the specific acts or omissions upon which the underlying violation is predicated." *In re Centennial Tech. Litig.*, 52 F.Supp.2d 178, 186 (D.Mass.1999) (*quoting Farley v. Henson*, 11 F.3d 827, 835 (8th Cir.1993)). *Centennial* was written before *Aldridge* but has been endorsed post-*Aldridge* by Judge Zobel in *In re Xcelera.com Securities*, 2002 WL 745835, *6 (D.Mass.2002). Both formulations can be reasonably squared with *Aldridge* though they provide divergent takes on the meaning of "actually exercise control." For Judge Keeton this implies the exercise of control over general operations, while for Judge Woodlock it seems to imply the exercise of control over the specific activities alleged. However, the language used in Judge Woodlock's formulation—though not his application—looks functionally similar to the first prong of Judge Keeton's test.

Since I find that Judge Keeton's formulation to be functionally similar to the holding in *Aldridge*, I will apply that standard.

### 2. *Analysis*

Defendants Quattrone and Rogers have both moved to dismiss Count II of the Second Amended Complaint. While the two defendants have filed separate motions, their supporting memoranda are nearly identical so I will discuss the two motions jointly. The motions raise two major arguments: first, that the Complaint does not adequately allege an underlying violation of the securities laws, and second, that the Complaint does not ade-

quately plead a factual basis for control person liability. The first argument essentially piggybacks on the omnibus motion to dismiss. Because I denied that motion, this argument cannot succeed.

▆▆▆ In support of their second argument, Defendants assert that the Complaint never alleges either a "significantly probative" factual basis that defendants actually exercised control over Kiggen and Martin, or that defendants actively participated in the decision making of Kiggen and Martin. Plaintiff responds that their pleadings go "well beyond a mere statement of 'general power' or 'status.'" Pl. Mem. at 8. The relevant portions of the complaint allege the following:

- Kiggen and Martin reported to the Global Head of CSFB's Tech Group, Defendant Frank Quattrone . . . and CSFB's Global Director of Technology Research, Defendant Elliott Rogers. (Compl.¶ 4).
- Kiggen reported to Quattrone and Rogers. Martin reported to Quattrone and Rogers. (Compl.¶ 9(c)-(d))
- As part of his employment at CSFB, Quattrone demanded, and received, responsibility over research and investment banking activities for the Technology Group. . . . Reportedly one of the most powerful executives at CSFB, anyone at CSFB who had anything to do with technology-related companies, including research analysts, traders and bankers, ultimately had to answer to Quattrone. (Compl.¶ 9(e)).
- Defendant Rogers was a Managing Director at CSFB and Global Director of Technology Research and reportedly Quattrone's deputy in charge of the Global Technology Group. (Compl.¶ 9(f)).
- On January 11, 2001, Martin sent an email to Kiggen, Rogers, and others entitled "Let's not Lie to Ourselves,"

in which she noted, "What's important that I don't say in my earnings preview is that the national advertising market is much weaker than 5 weeks ago." (Compl.¶ 17)

- On April 23, 2001, Kiggen forwarded one of Martin's emails to Rogers. Martin's email, discussing the fact that her analysis would be shared with AOL before being published said, "Don't worry, [AOL]'ll spin away and even if I'm right they'll give me new numbers (not in the financials) that make it not look so bad, and I'll publish whatever they add in the end." (Compl.¶ 44, 45).
- After Martin's analysis went over poorly with AOL, Kiggen emailed Quattrone and Rogers. The email subject line stated: "Seems We've Got a Problem." The email read, "Lammie [Laura Martin] pissing off AOL in a big way. I'll deal with company and her directly (as I have been on a daily basis), but I may need wing support from you if I can't get her to back off." JK (Compl.¶ 48)
- Quattrone responded asking for background, which Kiggen then provided in a subsequent email. (Compl.¶ 49)
- Rogers later responded to the email (sending a copy to Quattrone), saying "You have my high cover. What next did she do. With appropriate documentation I'll bring it up with Al Jackson if it warrants." (Compl.¶ 51)
- "Quattrone and Rogers acted as control persons over Defendants Kiggen and Martin within the meaning of Section 20(a) of the Exchange Act. They reviewed, approved, and controlled the content and dissemination of the analyst reports relating to AOL which Plaintiff contends are misleading". (Compl.¶ 141)

There are two ways to spin the above facts. Defendants argue that there is no evidence in the pleadings that Rogers or Quattrone exercised any control over Kiggen and Martin. The only claims regarding actual control are conclusory allegations, and the fact-specific pleadings reveal that Rogers and Quattrone simply received emails from the defendant analysts and Rogers promised "high cover" and to speak with somebody else if documentation was provided and "it warrants." Plaintiff, on the other hand, uses these pleadings to argue that it has shown (1) Rogers and Quattrone actually participated in key CSFB operations and (2) "Quattrone and Rogers had the power to control the dissemination of the 36 analyst reports." Pl. Mem. at 8.

In *Swack*, a case presenting similar allegations against the same defendants—albeit with somewhat less factual support—Judge Woodlock asserted that the allegations were insufficient to satisfy the PSLRA or Fed.R.Civ.P. 9(b). Defendants assert that the same is true in the instant case. The First Circuit discussed the clarity and basis requirements in *In re Stone & Webster, Inc., Secs. Litig.*, 414 F.3d 187 (1st Cir.2005). In finding that the pleadings before them satisfied both the PSLRA and 9(b), the First Circuit noted that "the PSLRA does not require the plaintiff to 'plead evidence.'" *Id.* at 199 (citing *In re Cabletron Systems, Inc.*, 311 F.3d at 30.) The First Circuit continued,

> As we understand, it was not Congress's intent to bar all suits as to which the plaintiff could not yet prove a *prima facie* case at the time of the complaint, but rather to prevent suits based on a guess that fraud may be found, without reasonable basis or a clear understanding as to what the fraud consisted of, but in the hope of finding something in the course of discovery.

*Id.* The Court also added a reminder that the PSLRA did not change the rule requiring that when "assessing a motion to dismiss for insufficient pleading, we must read the Complaint in the manner most favorable to the plaintiff, drawing reasonable inferences in the plaintiff's favor...." *Id.* at 200 (citing *Aldridge*, 284 F.3d at 79).

Although it is a close question on this record, viewing the Complaint in the light most favorable to Plaintiff and drawing all reasonable inferences in their favor, I find that the Complaint has pled enough to survive a motion to dismiss against both Rogers and Quattrone. Plaintiff has alleged that Rogers and Quattrone occupied positions in the company where they directed analysts like Kiggen and Martin. This alone is not sufficient to plead control person liability. But the complaint does contain additional information: specifically, emails sent between various parties at CSFB.

Kiggen sent an email to both Rogers and Quattrone, complaining that Martin was angering AOL. Quattrone responded—the only email from Quattrone cited in the complaint—with one word: "Background?" Plaintiff argues that this involvement, coupled with his position at CSFB, was sufficient to raise a reasonable inference of "control." Taking the inferences in favor of the Plaintiff, I believe the complaint is sufficient, although barely so.

Rogers received more emails, apprising him of the disconnect between the analysts' true feelings on AOL and the published reports. Rogers also responded to Kiggen's request for assistance with a promise of "high cover." When combined with Rogers's supervisory position, a reasonable inference can be drawn from the pleadings that he controlled the analysts.

For these reasons, I hereby **DENY** Defendant Rogers's motion to dismiss and **DENY** Quattrone's motion to dismiss.

## V. CONCLUSION

For the reasons articulated herein, I hereby **DENY** Defendants' general motion to dismiss (document # 94), **DENY** Defendant Rogers's motion to dismiss (document # 98), and **DENY** Defendant Quattrone's motion to dismiss (document # 100).

**SO ORDERED.**